[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a dissolution of a marriage wherein the parties intermarried at Bethel, Connecticut on August 11, 1984. The plaintiff has resided in the State of Connecticut for at least one year next prior to serving of the complaint or had returned to the State of Connecticut with the intention of permanently remaining here. The parties have one minor child issue of the marriage named Tyler Corson, born March 24, 1991. The marriage of the parties has broken down irretrievably with no hope of a reconciliation. CT Page 10147
A history of the marriage will help understand the court's findings. The parties had first met in high school and knew each other for approximately 6 years prior to the time of their marriage. At the time of the marriage the plaintiff was working in an office and the defendant was a floor or carpet installer working for someone else. Originally they lived in an apartment in Danbury and in December of 1986 bought a home in Waterbury, Connecticut. The down payment for the house came from a pension the plaintiff had and cashed in at the time. The down payment was for $5,000.00, which came out of her pension fund. In 1986 the defendant went into business for himself and the plaintiff was working at that time for Union Trust, first as a teller and then as a loan processor. The defendant was interested in bowling and the plaintiff evidently supported this activity. Sometime in 1987 he started playing golf and this seemed to create some problems between the parties as he was away from home for long periods of time on the weekends while playing
Both parties were interested in having a child but were unable to conceive. At some point in time, the defendant's parents who resided in Connecticut, relocated to North Carolina and in 1987 on a visit to North Carolina by the parties herein, the parents prevailed upon the defendant to consider a move also to North Carolina. The defendant then worked on the plaintiff to make such a move, thinking that the job opportunities were better in North Carolina and the cost of living was not only less but that also the life style was less hectic and would be easier on them. Eventually he prevailed upon her to move to North Carolina though she had reservations about leaving her family in Connecticut.
For the first several months they lived with his parents and meanwhile had purchased some land while living in North Carolina. The plaintiff worked for a short period of time for American Airlines, then for K-Mart, and some period of time for a lumber company. The defendant went into business again as a carpet installer and for awhile, was evidently doing well at said occupation. As above indicated, they purchased land and eventually built a home in North Carolina. However the plaintiff was not as happy as she had anticipated, being in a state far removed from her family.
Eventually, sometime in 1990 the plaintiff conceived and this resulted in the one child, issue of the marriage, born in CT Page 10148 March of 1991. At the time, neither parties had any medical insurance and as a result of the birth of the child were left with some substantial medical bills that had to paid off for both the prenatal care, delivery and the hospital costs. Six weeks after the birth of the child, plaintiff had to return to work because of these outstanding bills and because the income produced by the defendant's business was not as great as they would have liked it to be.
Originally, the defendant's mother had baby sat for the parties because of their both being at work but after a period of about two months she had to ask to be relieved of this duty because of some back problems. As a result, the child was put into day care. Also, to make it easier for the two of them to care for the child, the plaintiff took a job nights and weekends as a waitress so that she could be with the child during the day while the defendant was at work and he could be with the child in the evening while she was at work.
There were some difficult economic problems arising for the two parties making it difficult for them to sustain themselves in North Carolina. In July of 1992, plaintiff came to Connecticut on vacation and at that time indicated to her husband that she was unhappy in North Carolina and he indicated to her that if she could get a good job in Connecticut he would not object to returning. The plaintiff heard of vacancies at Kimberly-Clark, in the Danbury area, and made application there for work. Soon afterwards she was employed there and returned to Connecticut with her child. The defendant stayed in North Carolina to dispose of the home and to close up their activities and move their furniture north to Connecticut. The plaintiff had brought the child north with her and had placed the child, in day care while she was at work. Eventually, the house sold and the defendant came north around October of 1992.
At some point in time, around January or early February of 1993, the plaintiff told the defendant that she wanted a divorce. There is some question depending upon whose testimony is to believed, that at that time she was having an extra-marital relationship with one John Scalisi. She denies that there was any relationship other than that of him being a good friend. At the time the dissolution was commenced, the defendant claims that the plaintiff and Mr. Scalisi had known each other for a number of years and had been carrying on an CT Page 10149 affair prior to the commencement of the dissolution. There is no proof that there was any intimate relationship going at the time the dissolution was commenced though the plaintiff has admitted that since that time, her relationship with Mr. Scalisi has ripened into an intimate relationship.
The plaintiff had evidently been unhappy in the marriage for some time prior to the commencement of the dissolution and attempted to portray the defendant as a person who drank to excess and was subject to temper tantrums. The proof of his drinking was at the best not convincing upon the court. There was some evidence of casual social drinking on the part of the defendant and his consumption of beer, mostly at home, but never anything in an excessive amount. There was proof of his temper testified to: — one where he was bowling poorly one night and kicked the bowling ball return and broke his toe, and on one other occasion, after the child was born, he flung the child's playpen across the room and into a wall, having become upset about something. There was another time testified to where he in his anger punched a hole in the wall of their home.
There had been attempt at marital counseling in North Carolina but evidently that had been unsuccessful. The defendant did fight the dissolution for quite some time although he now seems reconciled to the inevitability of the marriage being dissolved.
The major issue between these parties is over custody of the child. Both parties are seeking custody. The plaintiff is looking for sole custody and the defendant is agreeable to joint custody. There were orders made pendente lite wherein the plaintiff has the child for four weeks in a row, then the child is transported to some exchange point originally in Virginia and later in Baltimore, Maryland and then the defendant has the child for a period of three weeks. The child is then transported back to the exchange point and the mother commences on her four week period of custody. The child is currently three and one-half years old.
The Family Relations Service has made a custody study in this case and the recommendation is that sole custody go to the plaintiff with reasonable and liberal rights of visitation with the defendant. The Connecticut Family Service worker did her home study on behalf of the plaintiff and then requested CT Page 10150 assistance from North Carolina in that they make a family study of the defendant. Both studies indicated that both parties were extremely responsible parents and that both of them would make an ideal custodial parent. The North Carolina study went a little further than doing merely a home study and actually made a recommendation that custody be granted to the defendant. This was done by the worker in North Carolina without ever having talked to the plaintiff or any of the plaintiff's references. The Connecticut case worker on the other hand had both her own study and that of the North Carolina case worker and made her decision based upon the findings on both sides of the issue.
The caseworker here in Connecticut had a couple of major concerns which are also concerns of the court. That is the frequent transportation of the child, especially by motor vehicle, for periods of up to twelve hours of travel on the highways for each exchange between the parties. Another area of concern for the Connecticut case worker was the inability of the defendant to resolve adult issues. "Inability to face up to adult issues" as perceived by the family service officer was a little bit confusing to the court until the plaintiff's attorney started cross-examining the defendant on the stand. At that time it became apparent that the defendant did not want to face up to the facts as they existed but was only interested in setting forth issues as he perceived them to be. The cross-examination was in fact a good example of the defendant's inability to face up to and resolve certain issues that had arisen in the marriage. Another thing that concerned the court was that the defendant is a very loving father, but to the extent that his love for the child was almost overwhelming and tended not to be realistic. Classic examples were that when the defendant found out that the plaintiff was pregnant he immediately went out and without consulting with the plaintiff spoke to a friend of his who was a designer of some kind and they designed and he built a nursery for the child, virtually with no input from the plaintiff the mother of child. Even today, his apartment is organized for the benefit of the child. It is almost representative of a Disney World type of fashion for the benefit of the child. When in the father's care, the child is evidently not being raised in a realistic world — in a world where a child has to learn, especially with a dissolution pending between the parents, that everything is not roses and sunshine. CT Page 10151
The caseworker in Connecticut found no negatives in the plaintiff's life and in her care for the child and in fact recommended that the plaintiff have custody.
As indicated earlier, the parties have custody on the basis of three weeks and four weeks with an exchange of the child at a point supposedly half-way between the father's home in North Carolina and the mother's home in Connecticut. Originally, the exchanges were taking place in Virginia which is closer for the defendant and further for the plaintiff and made for approximately an hour less driving for the defendant and over an hour extra driving for the plaintiff. The exchanges were then moved to Baltimore which is approximately half way between the two homes. The defendant had complained harshly about exchange in Baltimore because of the fact that there is no one to contact if one of the parties is going to be late and whether or not there were any safe places in Baltimore for the exchange to take place. The court is not completely unaware of the Baltimore area and feels that the defendant's concerns are not completely justified.
As a further indication of the defendant's inability to face up to adult issues is an occurrence this past winter when the exchange was supposed to take place on a Saturday and the weather reports indicated inclement weather in North Carolina. The mother agreed to postpone the exchange till Sunday or even Monday if necessary, since the weather continued to be bad on Sunday. The father could not make the exchange on Monday. The exchange therefore did not take place until the following weekend which gave the defendant an additional week of visitation with his child. Later in the year when it turned out that Mother's Day, which is in May, was going to fall while the child was visiting with the father, the mother asked if he would consider giving up the child a week early so that the mother could have the child on Mother's Day, and also to make up for the lost week that the mother endured because of the stormy weather. The defendant refused because he did not want to give up any of his visitation rights with the child.
The parties do not communicate well and since joint custody requires that the parties do communicate, and cooperate in determining what is in the best interest of the child relative to the child's upbringing, and anything else dealing with the child's health, care, welfare and education, CT Page 10152 the court has some concern relative to joint custody. About the only person who was concerned during the course of all the testimony about what was in the child's best interest seems to have come from the case worker from Connecticut. Her recommendations were actually based upon what she considered to be in the best interest of the child.
There is further concern whether or not transporting a child for 12 hours every third or fourth week is really in the best interest of the child or merely serving what the parents perceive as their right to have the child. There has been talk of shared parenting, however, in this particular case with the parties as far apart as they are, both physically and emotionally, shared parenting is not a viable method in the instant case.
The court is much concerned about the danger to which the child is exposed during these numerous trips back and forth between the parents. The court strongly feels that the best interest of the child could be served if the amount of exposure to the dangers of highway travel were cut considerably. This unfortunately will require a change in the visitation mode of the two parents. Because of the court's concerns about the welfare of the child and the constant travelling back and forth, and also taking into consideration that both parties are competent and loving parents, and also taking into consideration the fact that a child of three and one-half years generally bonds much closer with the mother than with the father, the court is going to grant joint custody to the parents.
This is with the understanding that if the defendant is reluctant to make any compromises dealing with the health, education and welfare of the child, that this could be a cause of concern which could give a rise to a potential change in custody.
The child shall remain with the mother for three months from October 1, 1994 and will then be transported to Baltimore where the father will pick up the child and have him for one month. The child at the end of the month shall be returned to the mother and commence another cycle of three months with the mother and one month with the father. Six weeks during the months of July and August shall be set aside for the father to have physical possession of the child as the court does not CT Page 10153 have any intention of cutting off the father's right to bond with the child. The parties will have to work out which six weeks but they must be consecutive.
The court is unaware at this point in time as to when the child will be entering the public education system of Torrington where the mother currently resides. If the child starts his public education in September of 1995, at that time physical possession will remain with the mother throughout the school year with reasonable rights of visitation with the father and the court will set forth what times this may be. The father can have the child during the summer vacation for six weeks during July and August but must return the child in time to reenter the school system at whatever date school commences. This is generally in late August according to some schedules in the Connecticut area. The father shall also have the right of visitation over Christmas Vacation, and also over any spring vacation that the school may have. If the parties can work it out for other holidays, such as Thanksgiving weekend or for any period in excess of three days, they may modify the father's visitation to include those periods of time. If the child does not enter the public school system in September of 1995 prior orders of three months and one month will remain in effect.
The defendant will pay in accordance with the child support guidelines to the plaintiff the sum of $116.00 per week to be suspended during the month that the child is spending with the defendant and during the summer period of time that the child remains with the defendant. During the period of time the child is with the father, the plaintiff mother shall pay the father the sum of $75.00 per week for child support. These figures are based upon the Connecticut child support guidelines. Plaintiff will provide medical insurance for the benefit of the minor child as available through her place of employment and the parties will divide equally any unreimbursed medical, dental, optical, orthodontic, psychiatric, prescription and psychological expenses. The defendant, since he will be sharing the brunt of the support shall have the federal tax exemption. Any capital gains on the North Carolina property for tax purposes shall be shared equally between the parties.
Another area of concern that has been brought to the court's attention is telephonic communication with the child. CT Page 10154 When with the parent having physical possession, telephonic communication shall be limited to two times per week and it shall be at a time just prior to the child's bedtime. The custodial parent is not to interfere with the conversation between the child and the non-custodial parent.
Neither party in this case has sought alimony so that the court will consider alimony waived and no alimony awards will be made. There seems to be another area of concern between the parties and that is as to the religious upbringing of the child. The court would hope that the parties could discuss how they would want the child brought up as far as exposure to religion and religious education. Currently, both are going their own way with the child and the court is not sure whether this couldn't result in some confusion for the child. It would be better for the parties to arrive at some agreement. Otherwise the court may have to step in and have to order that the primary custodial parent be the one to arrange for the religious upbringing of the child.
Since custody is joint, the court wants it understood by both parties that both of them are entitled to all information from any health care provider or any school or educational system concerned with the child and that they shall furnish each other with any and all authorizations necessary so that both may have full access to such information.
The court further finds that the Visa debt of $3,900.00 as shown on the wife's financial affidavit is for a fa family indebtedness and the defendant shall reimburse the plaintiff the sum of $1,950.00.
The parties shall both be liable to pay their own attorney's fees.
Based upon all of the above, the court will make it findings as follows:
The parties intermarried at Bethel, Connecticut on August 11, 1984. The plaintiff was domiciled in the State of Connecticut for at least one year next prior to the date of the commencement of these proceedings or returned to the State of Connecticut with the intention of permanently remaining here before the filing of the complaint. The court will further find that there is one minor child, born issue of this CT Page 10155 marriage, namely Tyler Corson, born March 24, 1991. The court will further find that the marriage of the parties has broken down irretrievably and accordingly will dissolve the marriage and enter orders relative to custody and support of the minor child as herein before set forth. Since neither party is seeking alimony, no alimony awards will be made.
Kline, State Trial Referee